IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA,   §
    Plaintiff,   §
       §
vs.    §      4:12-CR-731-ALL
       §
ASHLEY NICOLE RICHARDS   §
BRENT JUSTICE,   §
    Defendants.   §

GOVERNMENT'S CONSOLIDATED RESPONSE
TO MOTIONS TO DISMISS INDICTMENT

TO THE HONORABLE JUDGE OF SAID COURT:

The United States of America, "the government", files this Consolidated Response to Ashley Nicole Richards (Richards)' and Brent Justice (Justice)'s Motions to Dismiss the Indictment, and in support thereof would show the court the following:

# I.

# PROCEDURAL HISTORY; ALLEGATIONS OF THE INDICTMENT

## A.    Procedural history

On November 28, 2012, the Grand Jury for the United States District for the Southern District of Texas filed an Indictment, Criminal Case No. 4:12-CR-731, in which Richards and Justice were charged with creation of animal crush videos in violation of 18 U.S.C. §§ 48(b)(1)(B) and 2 (Counts One through Four); with distribution of animal crush videos in violation of 18 U.S.C. §§ 48(b)(2) and 2 (Count Five); with engaging in the business of selling or transferring obscene matter in violation of 18 U.S.C. §§ 1466(a) and 2 (Count Six); and with production and transportation of obscene matters for sale or distribution in violation of 18 U.S.C. §§ 1465 and 2. On December 5, 2012, Richards and Justice entered pleas of not guilty.

On January 22, 2013, Justice filed a Motion to Dismiss the Indictment; on January 30, 2013, Richards filed a Motion to Dismiss the Indictment.  Both motions sought dismissal of Counts One through Five of the Indictment: creation of animal crush videos (Counts One through

Four) and distribution of animal crush videos (Count Five), violations of

18 U.S.C. §§ 48(b)(1)(A) and (2).

## B.   The allegations of the indictment

The Grand Jury opens the indictment in controversy with an

introduction:

At all times material to the Indictment:

1.   The term "animal crush video" is defined, pursuant to
Title 18, United States Code, Section 48(a)(1), means "any
photograph, motion- picture film, video or digital recording,
or electronic image that –

(1) depicts actual conduct in which 1 or more non-
human mammals, birds, reptiles, or amphibians is
intentionally crushed, burned, drowned, suffocated, impaled,
or otherwise subjected to serious bodily injury (as defined in
section 1365, and including conduct that, if committed
against a person and in the special maritime and territorial
jurisdiction of the United States, would violate section 2241
or 2242); and

(2) is obscene."

2.   The term "engaged in the business" as defined,
pursuant to Title 18, United States Code, Section 1466(b),
means that the person who produces, sells, or transfers or
offers to sell or transfer obscene matter devotes time,
attention, or labor to such activities, as a regular course of
trade or business, with the objective of earning a profit
although it is not necessary that the person make a profit or
that the production, selling or transferring or offering to sell

3

or transfer such material be the person's sole or principal business or source of income.

Under Count One of the Indictment, the Grand Jury alleges:

## COUNT ONE
### (Creation of Animal Crush Videos)

On or about June, 2011, within the Southern District of Texas, and elsewhere,

### ASHLEY NICOLE RICHRDS
### BRENT JUSTICE

defendants herein, did knowingly create animal crush videos, including, but not limited to "puppy 1" and "puppy 2", intending and having reason to know that the videos would be distributed in, or using a means and facility of, interstate and foreign commerce.

**In violation of Title 18, United States Code, Section 48(b)(1)(A) and 2.**

Counts Two through Four contain the same allegation save for the following: Count Two was alleged to have been committed between February 22, 2010 and February 28, 2010, and the videos bore the titles "whitechick 1", "whitechick 2", and "whitechick 3." Count Three was alleged to have been committed between November 1, 2011, and August 15, 2012, and bore the title "blackluvsample." Count Four was alleged to

have been committed between November 2011 and August 8, 2012, and included among the titles "adammeetseve2."

Count Five alleges that on or about August 10, 2012, Richards and Justice knowingly distributed animal crush videos including "adammeetseve2" using a means and facility of interstate and foreign commerce in violation of 18 U.S.C. §§ 48(b) and (2).

## II.

## <u>SUMMARY OF THE MOTIONS TO DISMISS</u>

On January 22, 2013, Justice filed a Motion to Dismiss Counts One through Five of the indictment.  On January 30, 2013, Richards filed a Motion to Dismiss Counts One through Five of the Indictment.  Both motions are grounded on the proposition that 18 U.S.C. § 48 violates the First Amendment to the United States Constitution.   Justice and Richards proceed from the premise that § 48 is facially unconstitutional. In her conclusion, Richards summarizes the defendants' several complaints contending "that 18 U.S.C. § 48, as written, is an impermissible content based regulation of speech because (1) it fails to provide a nexus between the obscene depiction and the bodily injury

caused to the animal, and, as such is a vehicle for content discrimination unrelated to any distinctly proscribable content; (2) it erroneously equates depictions of the causation of injury to animals as obscene, i.e., the most patently offensive in its prurience, and is thus an attempt to expand the definition of obscenity; (3) it imposes enhanced penalties on speakers who express views on disfavored subjects; (4) and the content discrimination is not reasonably necessary or the least restrictive means to achieve any compelling governmental interest."   The Motions to Dismiss spring from the holding of the Supreme Court in *United States v. Stevens*, 130 S. Ct. 1577 (2010) in which the Court held that the predecessor to the current version of § 48 was facially unconstitutional. Careful review of *Stevens*, the Congressional findings entered in the wake of *Stevens* in anticipation of the amendment to § 48, and applicable First Amendment jurisprudence refutes Justice and Richards' several contentions.

# III.

## <u>WHAT THE SUPREME COURT HELD IN *U.S. v. STEVENS*</u>

In 2004, Robert J. Stevens was convicted in the United States District Court for the Western District of Pennsylvania for violations of 18 U.S.C. § 48, then styled "Depictions of Animal Cruelty." *United States v. Stevens*, 130 S. Ct. 1577, 1583 (2008). The en banc United States Court of Appeals for the Third Circuit vacated the conviction holding that 18 U.S.C. § 48 was facially unconstitutional. The United States petitioned for a writ of certiorari. 130 S. Ct. at 1584.

Before addressing the merits of United States' petition, the Court observed that the legislative background of § 48 "focused primarily on the interstate market for 'animal crush videos'":

> According to the House Committee Report on the bill, such videos feature the intentional torture and killing of helpless animals, including cats, dogs, monkeys, mice, and hamsters. H. R. Rep. No. 106-397, p. 2 (1999) (hereinafter H. R. Rep.). Crush videos often depict women slowly crushing animals to death "with their bare feet or while wearing high heeled shoes," sometimes while "talking to the animals in a kind of dominatrix patter" over "the cries and squeals of the animals, obviously in great pain." *Ibid.* Apparently, these depictions "appeal to persons with a very specific sexual fetish who find them sexually arousing or otherwise exciting." *Id.,* at 2-3. The acts depicted in crush videos are typically prohibited by

7

the animal cruelty laws of all 50 states and the District of Columbia. … But crush videos rarely disclose the participants' identities, inhibiting prosecution of the underlying conduct. See H. R. Rep., at 3 …

*Stevens*, 130 S. Ct. at 1583.

Stevens did not produce animal crush videos. The three counts of Stevens' indictment arose from his distribution of videos depicting dogfighting. 130 S. Ct. at 1583. Stevens' conviction was overturned when the en banc Third Circuit held 18 U.S.C. § 48 facially unconstitutional. *United States v. Stevens*, 533 F.3d 218 (3rd Cir. 2008). The Third Circuit held that § 48 regulates speech that is protected by the First Amendment. The Court of Appeals declined to recognize a new category of unprotected speech for depictions of animal cruelty and rejected the analogy between animal cruelty depictions and child pornography. "The Court of Appeals then held that § 48 could not survive strict scrutiny as a content-based regulation of protected speech. …It found that the statute lacked a compelling government interest and was neither narrowly tailored to preventing animal cruelty nor the least restrictive means of doing so. … It therefore held § 48 facially invalid." 130 S. Ct. at 1584.

The Supreme Court rejected the government's contention that § 48 complies with the Constitution because "the banned depiction of animal cruelty, as a class, are categorically unprotected by the First Amendment." The Court proceeded from the premise that the 1999 version of § 48 explicitly regulated "expression based on content: The statute restricts 'visual and auditory depictions, such as photographs, videos, or sound recordings, depending on whether they depict conduct in which a living animal is intentionally harmed. As such, § 48 is presumptively invalid, and the Government bears the burden to rebut that presumption." *Stevens*, at 1584. Thereafter, the Court granted the United States' petition for certiorari to determine "whether 18 U.S.C. § 48 was facially invalid under the Free Speech Clause of the First Amendment." 130 S. Ct. at 1587.

The Court observed that, "To succeed in a typical facial attack, Stevens would have to establish 'that no set of circumstances exists under which [ § 48] would be valid,' … or that the statute lacks any 'plainly legitimate sweep,' …" *Stevens*, 130 S. Ct. at 1587 (citations omitted). In rejecting the government's contention that Stevens could

not meet his burden, the Court alluded to a second type of facial challenge "whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *Id*. The Court observed that it "read § 48 to create a prohibition of alarming breadth." 130 S. Ct. at 1588. Notwithstanding the statute's ban on a "depiction of animal cruelty," the Court noted that the statute nowhere required "that the depicted conduct be cruel:"

> That text applies to "any … depiction" in which "a living animal is intentionally maimed, mutilated, tortured, wounded, or killed." § 48(c)(1).[1] "Maimed, mutilated, [and] tortured" convey cruelty, but "wounded" or "killed" do not suggest any such limitation.

*Stevens*, at 1588. Although the 1999 version of § 48 did not require "cruelty," the Court continued, it did require that the conduct be "illegal." The Court observed that this requirement in no wise limited the sweep of § 48:

---

[1] Under the 1999 provision, 18 U.S.C. § 48(c)(1) provided: "the term 'depiction of animal cruelty' means any visual or auditory depiction, including any photograph, motion picture film, video recording, electronic image, or sound recording of conduct in which a living animal is intentionally maimed, mutilated, tortured, wounded, or killed, if such conduct is illegal under federal law or the law of the State in which the creation, sale, or possession takes place, regardless whether the maiming, mutilation, torture, wounding, or killing took place in the State;…" 18 U.S.C. § 48(c)(1) (1999).

> There are myriad federal and state laws concerning the proper treatment of animals, but many of them are not designed to guard against animal cruelty.  Protection of endangered species, for example, restrict even the humane "wounding or killing" of living animals § 48(c)(1).  Livestock regulations are often designed to protect the health of human beings, and hunting and fishing rules (seasons, licensure, bag limits, weight requirements) can be designed to raise revenue, preserve animal populations, or prevent accidents.

130 S. Ct. at 1588.

Moreover, the application of the 1999-version of § 48 extended to conduct that is illegal in only a single jurisdiction.  Thus, "a depiction of entirely lawful conduct runs afoul of the ban if that depiction later finds its way into another State where the same conduct is unlawful."  The provision greatly expanded the scope of § 48 because "there is substantial disagreement on what types of conduct are properly regarded as cruel. Both views about cruelty to animals and regulations having no connection to cruelty vary widely from place to place."  130 S. Ct. at 1589.  The Court illustrated these observations with the District of Columbia's ban on all hunting and the variety of state agricultural regulations permitting different methods of slaughter of livestock.  *Id.*

The Court concluded that "an otherwise lawful image of any of these practices, if sold or possessed for commercial gain within a State that happens to forbid the practice, falls within the prohibition of § 48 (a)." *Stevens*, at 1590.

After considering the sweep of 1999's § 48 proscription, the Court addressed the exception provision of 18 U.S.C. § 48(b) (1999).  Under subsection (b), subsection (a) would "not apply to any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value."  18 U.S.C. § 48(b).  The Court observed that there was "simply no adequate reading of the exceptions clause that results in the statute's banning only the depictions the Government would like to ban." 130 S. Ct. at 1590.  Because much of what people say to one another lacks "religious, political, scientific, educational, journalistic, historical or artistic value," the First Amendment presumptively extends to many forms of speech that do not qualify for the serious value exception of § 48(b) but nonetheless fall within the broad reach of § 48(c). *Id*, at 1591.

The Court was similarly unimpressed with the government's assurance that the executive branch would construe § 48 to "reach only

'extreme' cruelty.  The Court observed that it "would not uphold an unconstitutional statute merely because the government promised to use it responsibly." *Stevens*, at 1591.  The Court deemed this assurance "an implicit acknowledgment of the potential constitutional problems with a more natural reading." *Id*.

The Court concluded that 1999's 18 U.S.C. § 48 was facially unconstitutional:

> Our construction of § 48 decides the constitutional question; the Government makes no effort to defend the constitutionality of § 48 as applied beyond crush videos and the depictions of animal fighting.  It argues that those particular depictions are intrinsically related to criminal conduct or are analogous to obscenity (if not themselves obscene), and that the ban on such speech is narrowly tailored to reinforce restrictions on the underlying conduct, prevent additional crime arising from the depictions, or safeguard public mores.

*Stevens*, at 1592.  Because the presumptively impermissible applications far outnumbered any permissible ones, the statute was deemed unconstitutional.  The Court held that the 1999 version of § 48 was substantially overbroad and therefore invalid under the First Amendment.  Germane to the instant controversy, the Court observed that it did not decide "whether a statute limited to crush videos or other

13

depictions of extreme animal cruelty would be constitutional."  130 S. Ct. at 1592.  This is the issue raised by Justice and Richards herein.

## IV.

## CONGRESS REACTS TO STEVENS: THE 2010 VERSION OF 18 U.S.C. § 48

### A.    Congressional findings

In the wake of *Stevens*, Congress quickly amended 18 U.S.C. § 48. The caption of the statute was changed from "depiction of animal cruelty" to "animal crush videos."  By the caption Congress signaled its intent to limit the proscription of the statute to animal crush videos. This intent was reinforced by express congressional findings:

The Congress finds the following:

(1) The United States has a long history of prohibiting the interstate sale, marketing, exchange and distribution of obscene material and speech that is integral to criminal conduct.

(2) The Federal Government and the States have a compelling interest in preventing intentional acts of extreme animal cruelty.

(3) Each of the several States and the District of Columbia criminalize intentional acts of extreme animal cruelty, such

as intentional crushing, drowning, suffocating, or impaling of animals for no socially redeeming purpose.

(4) There are certain extreme acts of animal cruelty that appeal to a specific sexual fetish.  These acts of extreme animal cruelty are videotaped and the resulting video tapes are commonly referred to as "animal crush videos".

(5) The Supreme Court of the United States has long held that obscenity is an exception to speech protected under the First Amendment to the Constitution of the United States.

(6) In the judgment of Congress, many animal crush videos are obscene in the sense that the depictions, taken as a whole –

    (A) appeal to the prurient interest in sex;

    (B) are patently offensive; and

    (C) lack serious literary, artistic, political, or scientific value.

(7) Serious criminal acts of extreme animal cruelty are integral to the creation, sale, distribution, advertising, marketing, and exchange of animal crush videos.

(8) The creation, sale, distribution, advertising, marketing, and exchange of animal crush videos is intrinsically related and integral to creating an incentive for, directly causing and perpetuating demand for the serious acts of extreme animal cruelty the videos depict. The primary reason for these criminal acts is the creation, sale, distribution, advertising, marketing, and exchange of the animal crush video image.

(9) The serious acts of extreme animal cruelty necessary to make animal crush videos are committed in a clandestine manner that –

    (A) allows the perpetrators of such crimes to remain anonymous;

    (B) makes it extraordinarily difficult to establish the jurisdiction within which the underlying criminal acts of extreme animal cruelty occurred; and

    (C) often precludes proof that the criminal acts occurred within the statute of limitations.

(10) Each of the difficulties described in paragraph (9) seriously frustrates and impedes the ability of State authorities to enforce the statutes prohibiting such behavior.

PUB. L. 111-294 § 3(c), Dec. 9, 2010, 124 STAT. 3177.

## B.   The 2010 enactment of 18 U.S.C. § 48

Consistent with its findings, Congress enacted an amended version

of 18 U.S.C. § 48:

### § 48.  Animal crush videos

**(a) Definition** – In this section the term "animal crush video" means any photograph, motion-picture film, video or digital recording, or electronic image that –

**(1)** depicts actual conduct in which 1 or more living non-human mammals, birds, reptiles, or amphibians is intentionally crushed, burned, drowned, suffocated, impaled, or otherwise subjected to serious bodily injury (as defined in

section 1365 and including conduct that, if committed against a person and in the special maritime and territorial jurisdiction of the United States, would violate section 2241 or 2242); and

**(2)** is obscene.

**(b) Prohibitions.** –

**(1) Creation of animal crush videos**. – It shall be unlawful for any person to knowingly create an animal crush video, if - -

(A) the person intends or has reason to know that the animal crush video will be distributed in, or using a means or facility of, interstate or foreign commerce; or

(B) the animal crush video is distributed in, or using a means or facility of, interstate or foreign commerce.

**(2) Distribution of animal crush videos**. – It shall be unlawful for any person to knowingly sell, market, advertise, exchange, or distribute an animal crush video in, or using a means or facility of, interstate or foreign commerce.

**(c) Extraterritorial applications**. – Subsection (b) shall apply to the knowing sale, marketing, advertising, exchange, distribution, or creation of an animal crush video outside of the United States, if –

(1) the person engaging in such conduct intends or has reason to know that the animal crush video will be transported into the United States or it territories or possessions; or

(2) the animal crush video is transported into the United States or it territories or possessions.

17

**(d) Penalty.** Any person who violates subsection (b) shall be fined under this title, imprisoned for not more than 7 years, or both.

**(e) Exceptions.** –

(1) In general. - This section shall not apply to any visual depiction of –

(A) customary and normal veterinary or agricultural practices;

(B) the slaughter of animals for food; or

(C) hunting, trapping, or fishing.

(2) Good-faith distribution. – This section shall not apply to the good-faith distribution or an animal crush video to –

(A) a law enforcement agency; or

(B) a third party for the sole purpose of analysis to determine if referral to a law enforcement agency is appropriate.

**(f) No preemption**. Nothing in this section shall be construed to preempt the law of any State or local subdivision thereof to protect animals.

18 U.S.C. § 48 (Added PUB. L. 106-152, § 1(a), Dec. 9, 1999, 113 STAT. 1732; amended PUB. L. 111-294, § 3(a), Dec. 9, 2010, 124 STAT. 3178).

## V.

## AMENDED 18 U.S.C. § 48 IS CONSTITUTIONAL

### A.   General principles regarding facial invalidation

The First Amendment generally prevents the government from proscribing speech, or even expressive conduct, because of disapproval of the ideas expressed.   Content based regulations are presumptively invalid.   From 1791 to the present, however, our society, like other free but civilized societies, has permitted restrictions on the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.   *R.A.V. v. City of St. Paul, Minnesota*, 505 U.S. 377, 382, 112 S. Ct. 2538, 2542-43 (1992); *Stevens*, 130 S. Ct. at 1584; *Brown v. Entertainment Merchants Association*, 131 S. Ct. 2729, 2733 (2011).   The freedom of speech referred to by the First Amendment does not include a freedom to disregard these traditional limitations.   "These limited areas – such as obscenity … incitement … and fighting words – represent 'well-defined and narrowly limited classes of speech, the prevention and punishment

19

of which have never been thought to raise any constitutional problem.'"

*Brown*, 131 S. Ct. at 2733 (quoting *Chaplinsky v. New Hampshire*, 315

U.S. 568, 572, 62 S. Ct. 766 (1942)); *Stevens*, 130 S. Ct. at 2543; *New*

*York v. Ferber*, 458 U.S. 747, 754, 102 S. Ct. 3348, 3353 (1982).

Justice and Richards challenge the constitutionality of the

amended 18 U.S.C. § 48 on its face as Stevens did the 1999 enactment.

In *United States v. Chapell*, 691 F.3d 388 (4th Cir. 2012), the Court of

Appeals observes that the Supreme Court has oft repeated that facial

invalidation of legislation is disfavored.   691 F.3d at 392 (citing *Wash.*

*State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450, 128 S.

Ct. 1184 (2008); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569,

580, 118 S. Ct. 2168 (1998)).   The Fourth Circuit explained that "because

claims of facial invalidity often rest on speculation, they raise the risk of

premature interpretation of statutes on the basis of factually barebones

records.   Facial invalidation is also contrary to principles of judicial

restraint, under which 'courts should neither anticipate a question of

constitutional law in advance of the necessity of deciding it nor

formulate a rule of constitutional law broader than is required by the

precise facts to which it is to be applied.' … Finally, 'facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Id.*

To succeed on their facial attack, Justice and Richards must "establish that no set of circumstances exists under which [the amendment] § 48 would be valid … or that the statute lacks any plainly legitimate sweep." *Stevens*, 130 S. Ct. at 1587; *Chapell*, 691 F.3d at 394. In *Stevens*, the Court cited a second type of challenge "whereby a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional judged in relation to the statute's plainly legitimate sweep. *Id.* As noted above, Stevens succeeded because the 1999 version of § 48 swept too broadly in that the impermissible applications of § 48 far outnumbered any permissible ones. 130 S. Ct. at 1592.

In his dissent in *Stevens*, Justice Alito outlines the limits of the First Amendment overbreadth doctrine. Justice Alito observes that "because an overly broad law may deter constitutionally protected

speech, the overbreadth doctrine allows a party to whom the law may be constitutionally applied to challenge the statute on the ground that it violates the First Amendment rights of others."   130 S. Ct. at 1593 (Alito, J., dissenting).   The overbreadth doctrine, Justice Alito explained, "seeks to balance the 'harmful effects' of 'invalidating a law that in some of its applications is perfectly constitutional' against the possibility that the 'threat of enforcement of an overbroad law will deter people from engaging in constitutionally protected speech.'"   *Id*, at 1594.   To determine whether a statute's overbreadth is substantial, the Court considers the statute's application to real world conduct, not fanciful hypotheticals.   The overbreadth claimant bears the burden of demonstrating "from the text of the law and actual facts that substantial overbreadth exists.   There must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Id*.

Justice Alito illustrated how the 1999 version of § 48 should have passed constitutional muster with specific reference to Congress' concern

with the creation, sale, or possession of "crush videos."  The dissenting

opinion prefaced the analysis with a description of what was depicted in

a sample crush video:

> A kitten, secured to the ground, watches and shrieks in pain
> as a woman thrusts her high-heeled shoe into its body, slams
> her heel into the kitten's eye socket and mouth loudly
> fracturing its skull, and stomps repeatedly on the animal's
> head.  The kitten hemorrhages blood, screams blindly in
> pain, and is ultimately left dead in a moist pile of blood-
> soaked hair and bone.

130 S. Ct. at 1598 (Alito, J. dissenting).  Justice Alito observed that all

50 States and the District of Columbia had enacted statutes prohibiting

animal cruelty.  However, before the enactment of § 48, the underlying

conduct depicted in crush videos was nearly impossible to prosecute.  *Id*.

Justice Alito suggested that the Court's reasoning in *New York v.*

*Ferber*, 458 U.S. 747, 102 S. Ct. 3348 (1982), in which the Court

addressed the constitutionality of proscriptions of child pornography,

should inform the analysis of the constitutionality of the proscription of

animal crush videos.  Before applying *Ferber*, Justice Alito observed:

> The First Amendment protects freedom of speech but it
> most certainly does not protect violent criminal conduct, even
> if engaged in for expressive purposes.  Crush videos present a
> highly unusual free speech issue because they are so closely

linked with violent criminal conduct.  The videos record the commission of violent criminal acts, and it appears that these crimes are committed for the sole purpose of creating the videos.  In addition, as noted above, Congress was presented with compelling evidence that the only way of preventing these crimes was to target the sale of the videos.

130 S. Ct. at 1598.

Justice Alito then applied *Ferber* to the prohibition of the creation and distribution of animal crush videos.  First, the dissent noted that with regard to "child pornography," *Ferber* focused on the fact that "the production of the work, not its content, was the target of the statute." *Stevens*, at 1599 (Alito, J. dissenting) (citing *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 249, 122 S. Ct. 1389 (2002)).  Second, *Ferber* emphasized the fact that "the underlying crimes could not be effectively combated without targeting the distribution of child pornography."  *Id.* (citing *Ferber*, 458 U.S. at 759 ("the distribution network for child pornography must be closed if the production of material which requires the sexual exploitation of children is to be effectively controlled.").  Justice Alito analogized § 48's ban on the distribution of animal crush videos to the ban on the distribution of child pornography: the ban facilitated the enforcement of the laws prohibiting cruelty to animals

24

observing that "taking the profit out of crime is a compelling interest." 130 S. Ct. at 1601. Justice Alito concluded that § 48 could be applied to "at least two broad real-world categories of expression covered by the statute" citing animal crush videos and dog-fighting videos. This conclusion supported the proposition that § 48 had "a substantial core of constitutionally permissible applications." The dissent rejected the proposition that 1999's § 48 banned a substantial amount of protected speech in absolute terms. Consequently, the dissent concluded that Stevens had not met his burden "of demonstrating that any impermissible applications of the statute are 'substantial' in relation to its 'plainly legitimate sweep.'" *Stevens*, at 1602 (Alito, J. dissenting).

**B.** **Why the amended 18 U.S.C. § 48 is not facially invalid**

The amended 18 U.S.C. § 48 narrowed the sweep of the statute's prohibitions. Congress expressly limits its application to the creation and the distribution of "animal crush videos." 18 U.S.C. § 48(b)(1) & (2). Congress made express findings contemporaneous to the statute's enactment that effectively set out the compelling government interest for prohibiting the creation and distribution of animal crush videos.

25

Thereafter Congress narrowly tailored the provision to enforce the compelling government interest and employed the least restrictive means to do so.  "In reviewing the constitutionality of a statute, 'courts must accord substantial deference to the predictive judgments of Congress.'"  *Turner Broadcasting System, Inc. v. Federal Communications Commission*, 520 U.S. 180, 195, 117 S.Ct. 1174 (1997). The Court explained the rationale for its deference to congressional findings:

> We owe Congress' findings an additional measure of deference out of respect for its authority to exercise the legislative power.  Even in the realm of First Amendment questions where Congress must base its conclusions upon substantial evidence, deference must be accorded to its findings as to the harm to be avoided and to the remedial measures adopted for that end, lest we infringe on traditional legislative authority to make predictive judgments when enacting nationwide regulatory policy.

520 U.S. at 196.

In its amendment to 18 U.S.C. § 48, Congress narrowly tailored the expressions which would be subject to the statute's sanctions.  As noted above, Congress revised § 48's caption from "Description of Animal Cruelty" to "Animal Crush Video."  The term "animal crush video" is

given a concrete definition.  "Animal crush video" is first defined in terms of the medium of production: "any photograph, motion-picture film, video or digital recording or electronic image."  The prohibited depiction is carefully delineated to be "actual conduct in which one or more non-human mammals, birds, reptiles, or amphibians is intentionally crushed, burned, drowned, suffocated, impaled, or otherwise subjected to serious bodily injury (as defined in section 1365[2] and including conduct that if committed against a person in the special maritime and territorial jurisdiction of the United States would violate section 2241 or 2242)[3];…"  18 U.S.C. § 48(a)(1).

In support of this prohibition, Congress specifically found that the United States has a long history of prohibiting the interstate sale, marketing, advertising, exchange, and distribution of obscene material and speech integral to criminal conduct.  The Federal Government and the States have a compelling interest in preventing intentional acts of

---

[2] Under 18 U.S.C. § 1365(h)(3), "serious bodily injury" means "bodily injury which involves (A) a substantial risk of death; (B) extreme physical pain; (C) protracted and obvious disfigurement; or (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty."
[3] Sections 2241 and 2242 of Title 18 United States Code proscribe the offenses of "aggravated sexual abuse" and "sexual abuse" respectively.  18 U.S.C. §§ 2241, 2242.

extreme cruelty.  To that end, each of the several States and the District of Columbia criminalize intentional acts of extreme animal cruelty, such as the intentional crushing, burning, drowning, suffocating, or impaling of animals for no socially redeeming purpose.  The majority opinion in *Stevens* acknowledged the evidentiary basis for these findings.  The Court specifically cited the historical foundation for legislation prohibiting animal cruelty.  130 S. Ct. at 1585 (citing The Body of Liberties § 92 (Mass. Bay Colony 1641), reprinted in American Historical Documents 1000-1904, 43 Harvard Classics 66, 79 (C. Eliot ed. 1910)). Justice Alito noted that every State and the District of Columbia had enacted legislation prohibiting animal cruelty.  130 S. Ct. at 1598 (citing H. R. REP. NO. 106-397, p. 3 (1999)).  The substantial factual basis for Congress' first three findings is well established.  These finding support the compelling government interest in prohibiting animal crush videos as defined under § 48(a)(1).

Section 48 (a) (2) requires that the depictions prohibited by the statute be obscene.  18 U.S.C. § 48(a)(2).  Congress specifically found that certain extreme acts of animal cruelty "appeal to a specific sexual

fetish.   These acts of extreme animal cruelty are videotaped and the resulting video tapes are commonly referred to as 'animal crush videos.'" Congress found that the Supreme Court has long held that "obscenity is an exception to speech protected under the First Amendment to the Constitution of the United States."   Further, "in the judgment of Congress, many animal crush videos are obscene in the sense the depictions taken as a whole (A) appeal to the prurient interest in sex; (B) are patently offensive; and, (C) lack serious literary, artistic, political, or scientific value."  *See Roth v. United States*, 354 U.S. 476, 486-87, 77 S. Ct. 1304 (1957); *Ginzberg v. New York*, 390 U.S. 629, 641, 88 S. Ct. 1274 (1966).

Congress' amendment to § 48 does not create a wholly new category of content based regulation.   Congress has grounded the provision on traditional, well-established definitions of obscenity. Section 48 thus adjusts the boundaries of an existing category of unprotected speech.  This distinguishes § 48 from a video game provision held to be constitutionally infirm in *Brown v. Entertainment Merchants Association*, 131 S. Ct. 2729, 2735 (2011).   Moreover, substantial

evidence supports Congress' finding that animal crush videos appeal solely to the prurient interest of sex.  Before amending § 48, Congress received the Written Testimony of Kevin Volkan, Chair and Professor of Psychology of California State University Channel Islands, Camarillo, California.   In his testimony, Professor Volkan explained the sexual nature of "crush" paraphilias and described how crush videos are sexual in nature and that those who watch such videos do so to obtain sexual gratification.   Hearing before the Senate Judiciary Committee: Prohibiting Obscene Animal Crush Videos in the Wake of *United States v. Stevens* (September 15, 2010).   In his testimony, Professor Volkan pointedly noted "that there is a well-established relationship between animal sadism and violent crime (Stone 2007) and some studies suggest there is a mental association between animal sadism and severe abuse in childhood.   Taken together, this points to animal sadism as an important warning sign of violent crime." *Id.*, p. 3 & n.1.   Professor Volkan concluded his testimony with this observation:

> Certain human males have the capacity to learn to become sexually aroused by watching crush videos.  In these videos the torture and killing of animals becomes associated with something males normally find sexually arousing, such

as a beautiful woman.  The treatment prognosis for those
involved in crush videos is very poor.  Treatment is not likely
to prevent the acquisition of a crush paraphilia, curb the
current practices of this paraphilia, or prevent a relapse.
Given the above characteristics associated with crush
paraphilias, I believe that a prohibition on the sale of crush
videos is one of the few ways in which the practice and
enjoyment of crush paraphilias can be reduced.

*Id.*, p. 7.  *See also, Stevens*, at 1583 (majority notes that animal crush

videos "appeal to persons with a very specific sexual fetish who find

them sexually arousing or otherwise exciting"( quoting H. REP. 106-397,

pp. 2-3).

Congress' definition of animal crush videos effectively removed the

content of these expressions from the ambit of First Amendment

protection.  Congress demonstrated that the content of animal crush

videos was criminal and fit within the historical notions of obscenity.

Congress expressly found that "serious criminal acts of extreme animal

cruelty are integral to the creation, sale, distribution, advertising,

marketing and exchange of animal crush videos."

Congress then set out two prohibitions designed to accomplish the

compelling government interest in regulating animal crush videos.  It

prohibited the creation of animal crush videos and it prohibited their

distribution.  18 U.S.C. § 48(b)(1) and (2).  Congress explained that the creation and distribution of animal crush videos created an incentive and perpetuated demand for the serious extreme acts of animal cruelty these videos depict.  Indeed, the sole reason for the criminal acts is the creation, sale, distribution, advertising, marketing, and exchange of the animal crush video image. Finally, Congress found that efforts to prohibit serious acts of extreme animal cruelty are thwarted by the fact that the acts are committed in a clandestine manner.  This allows the perpetrators of such crimes to remain anonymous.  It "makes it extraordinarily difficult to establish the jurisdiction within which the underlying criminal acts of extreme animal cruelty occurred and often precludes proof that the criminal acts occurred within the statute of limitations."

Finally, Congress took pains to insure that protected speech remained unaffected by the animal crush video prohibition.  Congress specifically excepted the depiction of any customary and normal veterinary or agricultural husbandry practice, the depiction of the

slaughter of animals for food, and any depictions of hunting, trapping, or fishing.  18 U.S.C. § 48(e).

## VI.

## <u>CONCLUSION</u>

The amended 18 U.S.C. § 48 prohibits and punishes a well-defined and narrowly limited class of speech which has never been thought to raise any constitutional problems.  *Brown*, 131 S. Ct. at 2741 (citing *Chaplinsky*, 315 U.S. at 571-72).  The conduct depicted in animal crush videos is universally deemed criminal in all 50 States and the District of Columbia.  It is beyond cavil that the content of animal crush videos is abhorrent to morality and virtue and designed to incite lust and depravity.  Indeed, the sole function of animal crush videos is to satisfy and whet the prurient interest of individuals with a very specific sexual fetish.  In light of the foregoing, the Motions to Dismiss the indictment filed by Defendants Ashley Nicole Richards and Brent Justice must be denied.

Respectfully submitted,

KENNETH MAGIDSON
United States Attorney

s/James L. Turner
JAMES L. TURNER
Assistant U.S. Attorney

s/Sherri Lynn Zack
SHERRI LYNN ZACK
Assistant U.S. Attorney
U.S. Attorney's Office for the
Southern District of Texas
1000 Louisiana Street, Suite 2300
Houston, Texas 77002
(713) 567-9374

ATTORNEYS FOR PLAINTIFF

34

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the above Government's Consolidated Response to Motions to Dismiss Indictment was electronically filed with the United States District Clerk for the Southern District of Texas was served by notice of electronic filing via this court's ecf system upon opposing counsels on February 15, 2013.

s/James L. Turner
JAMES L. TURNER
Assistant U.S. Attorney

s/Sherri Lynn Zack
SHERRI LYNN ZACK
Assistant U.S. Attorney

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

UNITED STATES OF AMERICA,  §
    Plaintiff,  §
      §
vs.  §  4:12-CR-731-ALL
      §
ASHLEY NICOLE RICHARDS  §
BRENT JUSTICE,  §
    Defendants.  §

## ORDER

After considering the record, it is hereby ORDERED and DECREED that the defendants' Motion to Dismiss is DENIED.

_____
UNITED STATES DISTRICT JUDGE

36